# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MATTHEW SALEN,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 3:14-cv-01361-VAB** |
| | : | |
| **BLACKBURN BUILDING SERVICES, LLC** | : | |
| **Defendant.** | : | |

## RULING ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff, Matthew Salen, brought this action against his former employer, Defendant

Blackburn Building Services, LLC ("Blackburn").  Mr. Salen asserts two causes of action against

Blackburn. The first and second counts of his Complaint allege that Defendant subjected him to a

hostile work environment.  Compl. ECF No. 1, at pp. 16-19.  He claims that this harassment

constituted discrimination against him on the basis of his sex in violation of the Connecticut Fair

Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §46a-51 *et seq.* and Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e *et seq.  Id.*  In the third and fourth counts, he

claims that Blackburn retaliated against him when he complained about the harassment, in violation

of the same statutes.  *Id.* at 19-22.   He requests compensatory and punitive damages as well as other

relief.  *Id.* at 23.

 Defendant moves for summary judgment on all of Mr. Salen's claims.  For the reasons that

follow, the motion is DENIED.

## I.    Factual Allegations[1]

Blackburn,  a family owned business, provides professional janitorial services in and around Waterford, Connecticut.  Def.'s L. R. 56(a) Stmt. ¶ 1.  Blackburn hired Matthew Salen as an Assistant Supervisor in November 2011.  *Id.* at ¶ 2.  Several days after he started working at Blackburn, the Company promoted Mr. Salen to Supervisor because the original Supervisor did not appear for work.  *Id.* at ¶ 4.

Irene and Steven Blackburn are owners and executives at Blackburn.  Def.'s L. R. 56(a) Stmt. ¶¶ 7-8.  The Blackburns are married, and three of their sons—Andre, Gabriel, and Manny—are relevant to this dispute.  *Id.* at ¶¶ 7-10.  Andre Blackburn served as Human Resources manager for Blackburn during the relevant time period.  *Id.* at ¶ 10.  Abigail Blackburn is Manny Blackburn's wife and worked as Marketing Manager for the Company.  *Id.* at ¶ 9.  Jorge Rodriguez, Maritza Soto, Brad Piscatelli and Ray Erazo worked as Supervisors for the Company.  *Id.* at ¶¶ 13-15.  Gabriel Blackburn assisted the company while Mr. Salen was employed there, but was not a Blackburn employee and rather worked full-time for the State of Connecticut.  Compl. ¶ 35.

 Andre Blackburn was away from work in April and May of 2013.  Compl. ¶ 11.  During his absence, a number of people shared human resources responsibilities, including Abigail Blackburn, Irene Blackburn and Jorge Rodriguez.  Def.'s L.R. 56(a) Stmt. ¶ 25.  The parties dispute the relationship between Mr. Salen and Mr. Rodriguez.  Defendants assert that the two were equal in authority, *see id*. at ¶ 66, while Mr. Salen claims that the two "were the same, or [Salen] was a little bit below" in "terms of the order of authority at the company."  *See* Pl.'s L.R. 56(a) Stmt. ¶ 66, citing Def.'s Mot., ECF No. 62-1, Appendix, Salen Dep. 83:5-8 (hereinafter "Salen Dep").

---

[1] The relevant facts are taken from defendants' Local Rule 56(a)(1) Statement and Exhibits attached to the Local Rule 56(a)1 Statement, ECF No. 62, and the plaintiff's Local Rule 56(a)(2) Statement, ECF No. 65.  *See* D. Conn. L. Civ. R. 56(a).

### a. The April 10, 2013 Incident

At around 5:00 p.m. on April 10, 2013, while Andre Blackburn and Mr. Salen were working in Blackburn's Waterford office, Andre Blackburn asked Mr. Salen to hang a poster on the wall of a conference room. Def.'s L. R. 56(a) Stmt. ¶ 20. Mr. Salen stood on a chair to hang the poster. *Id*. While Mr. Salen was doing so, Mr. Blackburn put his arms around Mr. Salen's waist for several seconds. *Id*. at ¶¶ 21-44. During his deposition, Mr. Salen stated that Andre Blackburn put his hands on Mr. Salen's penis for two seconds while Mr. Salen was standing on the chair. *Id*. at ¶ 23. At this point, Mr. Salen said, Mr. Blackburn was behind Mr. Salen, so that his face was touching Salen's "crack." *Id.* Salen Dep. 137: 10-11. *See also* Compl. ¶ 24 ("Mr. Blackburn was behind the chair the Plaintiff was standing on and Mr. Blackburn grabbed the Plaintiff from behind and wrapped his arms around his lower waist near his genital region, and in the same motion Mr. Blackburn placed his face in the Plaintiffs buttocks."). At this point, Mr. Salen stated that he "jumped off the chair and damn near ripped [Andre Blackburn's] face off." Salen Dep. 136:1-8.

In an e-mail response to an investigation about the incident, Andre Blackburn stated that he "wanted to hold onto Matt's waist just to make sure he was steady and would not fall" and that he "first asked [Salen] if it was okay, to which he replied 'yes.'" Gabriel Blackburn Investigation Report, 2, Pl.'s Opp. Mem, Ex. 10, ECF No. 65-23 (hereinafter "Gabriel Blackburn Investigation Report"). No one directly witnessed the incident, but Martiza Soto, a Blackburn supervisor, "saw Mr. Salen exit the office visibly upset" and Wilberto Santiago, night floor crew member, saw Mr. Salen standing on the chair through the conference room window. Pl.'s Stmt. of Disp. Facts, ECF No. 65-21, ¶ 3.

Mr. Salen occasionally worked with Andre Blackburn while employed at Blackburn. Def.'s L. R. 56(a) Stmt. ¶ 6. Until April 2013, Mr. Salen testified that he had "no issues" with Andre Blackburn. *Id. See* Salen Dep. 60:4-7. Mr. Blackburn is gay, and Mr. Salen admits to being

uncomfortable with gay people.  Def.'s Stmt. ¶ 60; Def.'s Mot. for Summ. J., 5; Salen Dep. 13: 7-11

("I have a problem when [homosexuals] try to touch me, when they try to play passes on me.").

Shortly after the incident, Andre Blackburn took leave from the office for several months.  Def.'s L.

R. 56(a) Stmt. ¶ 11.  He did not return to work until July 2013, but communicated with Blackburn

employees, as well as Mr. Salen, by e-mail and text message.

### b.  Blackburn's Response to the Incident

Mr. Salen felt uncomfortable after the incident and mentioned it to several Blackburn

officers.  He first reported the incident to Jorge Rodriguez, his supervisor, on the evening of April

10th.  Def.'s L. R. 56(a) Stmt. ¶ 24; Pl.'s L. R. 56(a) Stmt. Att. 1, ECF No. 65-1, Salen Aff., ¶ 3.  He

reported the incident to Abigail Blackburn, who served as the Company's interim Human Resources

Director, at some point one week later.  Salen Aff. ¶ 7; Def.'s L.R. 56(a) Stmt. ¶ 26.  On May 27,

2013, Abigail e-mailed the owners of the company, Irene and Steven Blackburn, to report Mr.

Salen's complaints.  *See* E-Mail Correspondence, 2, Pl.'s Opp. Mem., Ex. 12, ECF 65-11.  In the e-

mail Abigail Blackburn summarized the story that Mr. Salen had told her.

She wrote that: "Andre asked Matt to hang something up for him.  When Matt did this Andre

grabbed him around the waist and continued to hold on to him with his face near his rear.  Andre

asked him 'does this make you feel uncomfortable because if so I should not do it.'" *Id.*  Her e-mail

also stated that Andre had called Mr. Salen and "stat[ed] to him that he was dying." *Id.*  She added

that Mr. Salen was "very uncomfortable and will continue to be … unless it is addressed." *Id.* at 2-3.

Irene Blackburn responded to Abigail's e-mail on June 13, proposing a disciplinary plan. *Id.* at 7.

Specifically, she suggested that Andre should "apologize to Matt" and that there would be a "note in

Andre's file, as he never had an incident before or since, and anyone deserves a second chance." *Id*.

In the e-mail correspondence, Abigail Blackburn called Irene Blackburn "Mom" and Irene called

Abigail Blackburn "Abby." *Id*. at 2, 7.

4

Mr. Salen had also told Irene Blackburn about the incident at some point before June 2013. *Id.* at 27-30.  At this meeting, he told Irene Blackburn that he was "worried' about Andre and otherwise answered her questions about the encounter.  Salen Dep. 225:21-227:7.  He "complained about physical touching to Abigail and Irene," but did "not mention Andre touching his penis or putting his face in Salen's butt." *Id.* at 29.  At this meeting Irene Blackburn also asked Mr. Salen if his job at Blackburn was "the best job [he'd] ever had."  *Id.* at 225: 15-18.

Irene Blackburn's disciplinary proposal never came to fruition.  The e-mail correspondence in the record, as well as Plaintiff's opposition brief, suggests that Abigail Blackburn prepared a report for Andre Blackburn to sign and planned for him to "formally apologize" to Mr. Salen around June 18, 2013.  *See* E-Mail Correspondence, Pl.'s Opp. Mem., Ex. 12; Pl.'s Opp. Mem., 5.  On the day of the interview, it was cancelled.  Compl. ¶ 35.

Eventually, Gabriel Blackburn, who worked for the State of Connecticut and not for Blackburn, conducted an investigation of the incident.  Def.'s L.R. 56(a) Stmt. ¶ 30.  At deposition, Irene Blackburn stated that she asked Gabriel to conduct the investigation because "he owe[d her] big time" and because he "ha[d] the skills," since he is a Director of Human Resources.  *Id.* at Appendix, Irene Blackburn Dep. 66: 14-16.  She clarified that Gabriel Blackburn did not owe her money, but rather owed her a favor.  *Id.* at 62: 6-8.

Gabriel Blackburn interviewed and took statements from several witnesses to the incident, namely Mr. Salen, Wilberto Santiago, Jorge Rodriguez and Martiza Soto.  *Id.* at ¶ ¶ 31-32.  The parties dispute whether Gabriel Blackburn interviewed every witness to the incident.  Plaintiff contends that Gabriel Blackburn did not interview Andre Blackburn, Irene Blackburn or Abigail Blackburn.  Pl.'s Stmt. of Disp. Facts, ECF No. 65-21, ¶ 6.  Gabriel Blackburn's report does contain a statement that Andre Blackburn submitted by e-mail.  *See* Gabriel Blackburn Investigation Report, 2.

As a component of his investigation, Gabriel Blackburn prepared a statement for Mr. Salen to sign.  *See* Def.'s L.R. 56(a) Stmt, Appendix, Gabriel Tr., at 27:6-20, *see also* Gabriel Blackburn Investigation Report, 2.  The signed statement given by the Plaintiff to the Defendant dated June 18, 2013 makes no mention of Andre Blackburn putting his face in the Mr. Salen's buttocks or touching Mr. Salen's penis.  *See id.*  Rather, the statement says that the Plaintiff "was holding the sign and he [Andre Blackburn] grabbed me by waist and the chair."  *Id.*  Plaintiff admits that he signed the statement but denies that his signature was given "by his own free will."  Pl.'s L.R. 56(a) Stmt. ¶ 33. Mr. Salen admits that he did not tell Gabriel Blackburn during the interview that Andre Blackburn had touched his penis or put his face in his "crack," but said that he did not mention this because "it was not asked."  *Id.* at ¶ 39, Salen Dep. 222: 17-22. Gabriel Blackburn's investigation notes indicate that Mr. Salen had said that he was "not filing any type of sexual harassment or anything but wanted to report it because he felt uncomfortable and didn't want to lose his job over this incident."  *See* Pl.'s Opp. Mem, Ex. 10, Blackburn Investigation Report, 2.

On July 23, 2013, Gabriel Blackburn issued a memorandum to Mr. Salen entitled "Closeout notice and letter of expectation," which concluded that: "There is no evidence to substantiate any type of work rule or policy violation by Andre Blackburn.  Matt [Salen] himself stated that he didn't want to make a big deal about this and to report it. He acknowledges that he was not harassed." Gabriel Blackburn Investigation Report, 2; Def.'s L.R. 56(a) Stmt. ¶ 49.  The letter thanked Mr. Salen for bringing the matter to the attention of Jorge Rodriguez, which was "the proper channel to communicate confidential issues related to coworkers." *Id.* at ¶ 50.

Prior to filing the closeout notice, Gabriel Blackburn heard that Mr. Salen discussed the incident with Maritza Soto and Wilberto Santiago, two of his co-workers.  Def.'s L.R. 56(a) Stmt. ¶ 53.  Mr. Blackburn indicated in the July 23, 2013 letter that he had learned that Mr. Salen had shared the information about his complaint with co-workers who had "no business being involved."  *Id.* at

6

Appendix, Ex. 5, Closeout Notice.  He noted that the memorandum would serve as a "letter of expectation" that the Plaintiff would not do this in future incidents.  *Id.*  The parties dispute whether the letter was disciplinary in nature.  *Compare* Pl.'s L. R. 56(a) Stmt. ¶ 57 and Def.'s L.R. 56(a) Stmt. ¶ 57.

Mr. Salen had been "counseled or coached" on the need for confidentiality on three occasions beforehand. Def.'s L.R. 56(a) Stmt. ¶ 54.  *See also* Salen Dep. 110:6-19.  On one of these occasions, Mr. Salen suggested in a Facebook posting that he had seen a person steal a toothbrush.  Pl.'s Opp. Mem., 3, citing *id.* at Ex. 8, ECF No. 65-10, January 26, 2012 Memorandum.  In the second instance, Mr. Salen asked another supervisor about his recent drug test.  *Id.*

Around the time of the "letter of expectation," Mr. Salen received a raise from $14.25 per hour to $14.50.  Def.'s L.R. 56(a) Stmt. ¶ 59.  The record does not establish conclusively why Mr. Salen received a raise.  Andre Blackburn testified that he didn't "determine solely who hands out money" and did not participate in the decision to give Mr. Salen a raise.  Def.'s L.R. 56(a) Stmt. Appendix, Andre Blackburn Dep. 124: 6-16 (hereinafter "Andre Blackburn Dep.").

### c.  Blackburn's Sexual Harassment Policy

Blackburn's Employee Handbook includes a sexual harassment policy that states that it is "against the policies of the Company for any employee of the company, for an employee of the Company, male or female, to harass another employee sexually, that is, by making unwelcome sexual advances, sexual favors or other uninvited verbal or physical conduct of a sexual nature." Salen Aff., Ex. 4, ECF 65-6, Employee Handbook, pp. 10-11.  The Handbook also sets out a complaint procedure.  *Id.* at 11.  Under the Handbook, an employee should "initiate a complaint with the senior manager [designated to handle workplace harassment complaints] as soon as possible."  *Id.* The Handbook explains that the Senior Manager will then:

promptly have a confidential preliminary investigation made into the matter.  If, after the completion of this preliminary investigation, it is determined that there is cause for finding a violation of this policy, the Company will notify the complainant and the charged of the finding, orally.  The charged employee will be requested to respond to the complaint. … After the response of the charged employee has been made, and any further investigation that is warranted has been carried out, the Company will make a final decision. If the Company finds that the allegations in the complaint have been established by the investigation, the Company will initiate discipline [that is] appropriate to the offense and the employees involved and may include discharge.

*Id*. at 11. The record does not establish whether Blackburn had designated a specific managerial employee to receive workplace harassment complaints during the time period relevant to this lawsuit.

### d.  Other Harassment at Blackburn

After the incident, Mr. Salen felt that he "wasn't being treated right by employees."  Def.'s L. R. 56(a) Stmt. ¶ 69; Salen Dep. 235:6-7. Shortly after September 2013, several co-workers had stated to the Plaintiff that Salen was "Andre's lover boy" and that when he would get a phone call they would say, "Oh. is that Andre on the phone?" Def.'s L. R. 56(a) Stmt. ¶ 71; *see also* Compl. at ¶ 30. Mr. Salen said that he "was the joke of Blackburn."  Salen Dep. 236: 24-25. The parties dispute whether these are the only comments the Mr. Salen described his co-workers making to him in connection with the April 10, 2013 incident.  The comments began shortly after September 2013. Salen Dep. 237: 22-23.

Mr. Salen testified during his deposition that he did not tell Abigail Blackburn about co-workers making fun of him regarding the incident during the meeting between him, Abigail Blackburn and Jorge Rodriguez.  Def.'s L. R. 56(a) Stmt. ¶ 70; Salen Dep. 209:16-212:15.  Later, he did mention his co-workers' disturbing behavior to Abigail Blackburn and Jorge Rodriguez during a conversation on the porch. Salen Dep. 234:20- 235: 7. He also did not complain about the treatment to Andre, Gabriel, Irene or Steven Blackburn.  *Id.* at ¶ 73.

8

### e. Mr. Salen's Termination

On September 20, 2013, Mr. Salen submitted a resignation letter to Ray Erazo, stating: "[a]s of today I am unfortunately putting in my two week notice to end my employment. Thanks for everything." Def.'s L. R. 56(a) Stmt. ¶ 83, *id.* at Appendix, Ex. 11, Resignation Letter. At his deposition, Mr. Salen stated that he did not intend to work at Blackburn after the expiration of the two week period, because he was "going to leave with respect." *Id.* at ¶ 86; Salen Dep. 30:5-11.

After several meetings, supervisors at Blackburn decided that "it would be in the company's best interest to accept the Plaintiff's resignation effective immediately." *Id.* at ¶¶ 88-90. *See also* Andre Blackburn Dep. 123: 8-17 ("when we received his resignation we decided to accept that, and accept it effective immediately as opposed to waiting two more weeks for him to still work, be exposed to clients, be exposed to other employees, and it didn't seem good for morale."). Several Blackburn employees participated in these meetings, namely Reinaldo Erazo, Jorge Rodriguez, and Steve, Abigail, Irene and Andre Blackburn." *Id.* at 147: 4-19 (referencing a "huddle").

Mr. Salen maintains that defendant terminated his employment because "he did not resign, and the defendant did not accept [his] resignation." Pl.'s Stmt. of Disp. Facts, ECF No. 65-21, ¶ 12. He collected unemployment payments for one and a half to two years after his termination. Salen Dep. 30: 12-19. On October 5, 2013, Mr. Salen's Facebook page contained a post that said "I can honestly say I'm glad I quit my job." *Id.* at 42: 1-2. Mr. Salen maintained at his deposition that he was fired, and "it doesn't matter what [he said] on Facebook." *Id.* at 43: 17-19.

On October 17, 2013, the Administrator of the Connecticut Department of Labor concluded that Blackburn had discharged Mr. Salen. Department of Labor Decision, Pl.'s Opp. Mem., Ex. 6, ECF No. 65-7. Blackburn appealed. *Id.* On November 25, 2013, the Department's appeals referee also concluded that Blackburn had "discharged" Mr. Salen. *Id.* The notice said "when an employee has submitted notice of his intention to leave his job at a future date, is not allowed by the employer

to work out his notice, and is not paid for the remainder of the time specified in the notice, the intent to leave voluntarily is never consummated." *Id.*

On October 15, 2013, Mr. Salen applied for unemployment compensation benefits from the Department of Labor.  In his application, Mr. Salen said that "the reason [he] wanted to leave was due to being harassed by Andre Blackburn, the owner's son."  *Id.* at Ex. 15, ECF No. 65-12, Fact Finding Report-Claimant Statement.  He added his description of the events of April 10: "When I got up on the chair Andre just put his face between my buttocks as he grabbed my waist, he asked me if I was uncomfortable." *Id.*  He also said that he was "coerced" by Gabriel Blackburn into signing a statement saying that Andre Blackburn did not harass him.  *Id.*

### f. Mr. Salen's Administrative Complaints

On December 18 2013, Mr. Salen made a complaint to the Connecticut Commission on Human Rights and Opportunities ("CHRO").  In his complaint, Mr. Salen stated that "[w]hile leaning forward to hold the picture, Andre positioned himself between me and the wall, then intentionally moved the chair so that I moved causing his face to come into contact," which implies, as Defendant points out, that Blackburn was on the other side of the chair, facing Salen's front.  Def.'s L. R. 56(a) Stmt. ¶ 44; *Id.* at Appendix, Ex. 4, CHRO Complaint. He also stated that he "submitted his letter of resignation with the intent of constructively discharging himself."  *Id*. at 4.  Frank Malinconico, a CHRO investigator, concluded that Mr. Salen had not experienced a violation of the CFEPA.  Mr. Malinconico states that Mr. Salen never "mentioned anything" about Andre Blackburn "touching his penis" or "placing his face in Mr. Salen's buttocks."  Def.'s L. R. 56(a) Stmt. Appendix, Malinconico Aff.

Mr. Salen filed his Complaint on September 18, 2014, alleging violations of Title VII and CFEPA.  In his Complaint, he alleged that "Mr. Blackburn was behind the chair the Plaintiff was standing on and Mr. Blackburn grabbed the Plaintiff from behind and wrapped his arms around his

10

lower waist near his genital region, and in the same motion Mr. Blackburn placed his face in the

Plaintiffs buttocks."  Compl. ¶ 24.  He alleges violations of the prohibitions against sexual

harassment and retaliation included in both Title VII and CFEPA.  *Id.* at pp. 16-22.[2]

## II.   Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that no

genuine issues of material fact remain in dispute and that it is thus "entitled to judgment as a matter

of law."  Rule 56(a), Fed. R. Civ. P.  A fact is "material" if it "might affect the outcome of the suit

under the governing law" and a factual issue is "genuine" if "a reasonable jury could return a verdict

for the nonmoving party" based on it.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In reviewing the record, this Court must "construe the evidence in the light most favorable to

the non-moving party and draw all reasonable inferences in its favor."  *Gary Friedrich Enters.,*

*L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citations omitted).   If there is

any evidence in the record from which a reasonable factual inference could be drawn in favor of the

opposing party on the issue on which summary judgment is sought, summary judgment is

inappropriate.  *See Sec. Ins. Co. of v. Hartford Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d

---

[2] Defendant encourages the Court to disregard Mr. Salen's deposition testimony about Mr. Blackburn touching his penis because it contradicts statements he made earlier about his harassment.  Generally, it is the jury's role to assess the credibility of a plaintiff's story.  At the summary judgment stage, the court can only discredit a plaintiff's testimony in the "rare circumstances where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  While a party may not "create an issue of fact precluding summary judgment" by offering a "sham affidavit" contradicting his earlier sworn testimony, *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112-13 (2d Cir. 1998), as amended by 169 F.3d 782 (2d Cir. 1998), if there is a "plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony," especially if "an earlier account … was ambiguous, confusing, or simply incomplete."  *Id.*  The Court cannot conclude that the discrepancies between Mr. Salen's initial representations are inherently inconsistent.  Mr. Salen has proposed several "plausible explanations" for these discrepancies—that he was never specifically asked about whether Andre Blackburn touched his penis, that he felt coerced by Blackburn employees, and that it was Mr. Blackburn's brother who was conducting the investigation.  As a result, the Court declines to adopt *Jeffrey*'s "narrow exception" to the general rule that credibility determinations are not to be made on motions for summary judgment.  *See Jeffreys*, 426 F.3d at 554.

Cir. 2004); *Anderson*, 477 U.S. at 250 (summary judgment is proper only when "there can be but one reasonable conclusion as to the verdict").

**III.   Discussion**

   **a.   Exhaustion of Administrative Remedies**

   Title VII requires a claimant to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged discriminatory action. 42 U.S.C. § 2000e-5(e)(1).  The record in this case does not suggest that Mr. Salen filed a complaint with the EEOC at all.

   The failure to exhaust administrative remedies is a "precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement."  *Francis v. City of N.Y.*, 235 F.3d 763, 768 (2d Cir. 2000).  In *Francis*, the Second Circuit acknowledged that the exhaustion requirement through the EEOC was "an essential element of Title VII's statutory scheme and one with which defendants are entitled to insist that plaintiffs comply."  *Id.*  However, the *Francis* court concluded that the defendants had waived their right to object on exhaustion grounds because they had not alleged any failure to exhaust administrative remedies in their Answer to the Complaint, and in fact had not registered any objection until after the court's judgment, even "after the district judge explicitly raised doubts" about the issue.  *Id.* ("under the circumstances, there can be no doubt that the City waived any right to complain about deficiencies in the EEOC charge.")  Because Blackburn did not allege that Mr. Salen failed to exhaust his administrative remedies in either its Answer or its Motion for Summary Judgment, the Court concludes that Blackburn has waived its right to complain on this ground.[3]

_____

[3] The Court notes that Mr. Salen's complaint before the CHRO omitted crucial details regarding his allegations of sexual harassment and constructive discharge.  The Court declines to find that these omissions deprived the CHRO

**b. Sexual Harassment under Title VII and CFEPA**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions or privileges of employment because of [among other grounds] such individual's [ ] sex." 42 U.S.C. §2000e-2(a)(1).  CFEPA analogously prohibits an employer from discriminating against an employee with respect to compensation or "conditions or privileges of employment" because of his sex, among other grounds. Conn. Gen. Stat. §46a-60(a)(1). The standards governing CFEPA employment discrimination claims are the same as those governing Title VII.  *See Martinez v. Conn., State Library*, 817 F. Supp. 2d 28, 55 (D. Conn. 2011) (collecting cases).

Sexual harassment is also "[o]ne form of gender discrimination prohibited by Title VII." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)).  The EEOC Guidelines define "sexual harassment" to include "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor Sav. Bank, FSB*, 477 U.S. at 65 (quoting 29 CFR §1604.11(a)). CFEPA expressly prohibits employers from engaging in sexual harassment. Conn. Gen. Stat. §46a-60(a)(8).  Like the EEOC, CFEPA defines "sexual harassment" as "any unwelcome

---

of the opportunity to investigate his charges. "[C]laims that were not asserted before the EEOC [or CHRO] may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency." *Javier v. Deringer-Ney, Inc.*, 578 F. Supp. 2d 368, 372 (D. Conn. 2008), citing *Legnani v. Alitalia Linee Aeree Italiane*, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001) ("A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC [or CHRO] investigation which can reasonably be expected to grow out of the charge that was made.").  The Court finds that Mr. Salen's checking of the box labeled "sexual harassment" gave the agency sufficient information about the charges he is making here, because an investigation into Mr. Blackburn's conduct would be expected after this charge.  When reviewing complaints before the EEOC or related agencies, the Court must "read complaints broadly to ascertain whether the allegations in them are "reasonably related" to those in a subsequent lawsuit. *Alonzo v. Chase Manhattan Bank*, N.A., 25 F.Supp.2d 455, 458 (S.D.N.Y. 1998) ("In determining whether a particular claim is reasonably related to the plaintiff's EEOC complaint, [w]e look not merely to the four corners of the often inarticulately framed charge, but take into account the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination") (internal quotation marks omitted).

sexual advances or requests for sexual favors or any conduct of a sexual nature." Conn. Gen. Stat. §46a-60(a)(8).

To survive summary judgment on a hostile work environment claim under Title VII and CFEPA, Mr. Salen must show that (1) a hostile work environment existed because of his gender and (2) "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir. 1998) (citation omitted); *see also Brittell v. Dep't. of Corr.,* 247 Conn. 148, 166- 67 (1998) (applying the same standards to a hostile work environment claim under CFEPA).

### 1.    Hostile Work Environment

Blackburn argues that the "fleeting moments of alleged harassment" that Salen describes are insufficiently pervasive to justify his hostile work environment claim.  Mr. Salen counters that a single incident of harassment, when it is as severe as the one he alleges here, can create a material fact about whether a hostile work environment existed. The Court agrees with Mr. Salen.

An employee alleging a hostile work environment must create a genuine issue of material fact as to whether his workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal citations omitted).  The Court must find that the work environment was "both objectively and subjectively offensive," looking at the totality of the circumstances.  *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998) (citation omitted) (under Title VII); *accord Brittell,* 247 Conn. at 167 (same under CFEPA) (citation omitted).

Generally, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII."  *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304, n.5 (2d Cir. 1995) (citations omitted).

14

However, when an employer's single act is "sufficiently severe," it may "alter the plaintiff's conditions of employment without repetition," rising to the level of actionable harm.  *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998); *Tomka*, 66 F.3d at 1305 ("Even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability."); *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) ("single incident of verbal harassment" was sufficient, considering all the circumstances, because supervisor's verbal harassment was obscene, loud, and occurred in "a large group in which Howley was the only female and many of the men were her subordinates.").  *But see Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577-78 (2d Cir. 1989) (to be actionable, the alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive"); *Quinn*, 159 F.3d at 759 (affirming district court's grant of summary judgment when plaintiff alleged that her supervisor told her that she had been "voted the 'sleekest ass' in the office" and on another occasion "deliberately touched [her] breasts with some papers that he was holding in his hand").

Even isolated incidents of unwanted contact with the "intimate parts of an unconsenting employee's body" can justify a claim of an objectively hostile work environment.  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 179-80 (2d Cir. 2012).  In *Redd*, the court found that a plaintiff's claim of a hostile work environment could survive summary judgment when a co-worker had touched her breasts "without any apparent legitimate need" after "contriv[ing] to be in close proximity" to her. *Id.  See also Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001) ("direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment."); *Flowers v. N. Middlesex YMCA*, No. 3:15-cv-705 (MPS), 2016 U.S. Dist. LEXIS 31469, at *13-14 (D. Conn. Mar. 11, 2016) ("Physical abuse, such as unconsented touching and striking — particularly on sensitive areas of the

body such as buttocks or breasts — are more severe than other forms, such as vulgar banter. … In this sense, Thortenson's alleged 'striking' of Flowers buttocks was particularly severe") (internal citations omitted).

Here, a jury could conclude that Mr. Salen's experience at Blackburn was "objectively offensive." *Faragher*, 524 U.S. at 787.  Mr. Salen alleges that Andre Blackburn touched his penis, albeit briefly, and then asked if he felt uncomfortable.  He further alleges that his co-workers mocked him for being "Andre's lover boy."  A reasonable juror could conclude that Andre's touching, especially combined with teasing from Blackburn's employees, was more than "ordinary socializing in the workplace," "male-on-male horseplay," or "intersexual flirtation" and instead amounted to a hostile work environment.  *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 81 (1998). Especially given the significance that the *Redd* court placed on the unwanted touching of an intimate body part, the Court must conclude that Mr. Salen's allegations rise to the level of actionable sexual harassment.

Hostile work environment claims present "'mixed question[s] of law and fact' that are 'especially well-suited for jury determination.'" *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 605 (2d Cir. 2006) ("the line between boorish and inappropriate behavior and actionable sexual harassment ... is admittedly indistinct, [and] its haziness counsels against summary judgment."). Here, a jury would be best positioned to determine whether to believe Salen's conflicted testimony about Andre Blackburn's treatment and whether this testimony suggested that he was subjected to a hostile work environment.

Mr. Salen has also provided sufficient, if limited, evidence that would enable a reasonable juror to conclude that he subjectively found his work environment pervasively hostile.  When a plaintiff alleges that treatment caused depression, anxiety and other "psychological tolls," the

plaintiff has made a sufficient claim for subjectively hostile treatment.  *Feingold v. New York*, 366

F.3d 138, 151 (2d Cir. 2004) (finding that testimony by plaintiff that the defendant's treatment of him

"took a psychological toll on him, causing him to become depressed, to dread going to work, to seek

a transfer, and to lose his desire to socialize with people in general" satisfied the subjective element

of a hostile work environment claim).  Mr. Salen stated that he felt "uncomfortable" after the

incident.  Def.'s L.R. 56(a) Stmt. ¶ 24.

Several of Mr. Salen's coworkers agreed with that assessment.  Indeed, Gabriel Blackburn

recounted that Salen "seemed a little upset and needed to talk to people in the office."  Accepting this

testimony as true, as the Court must at this stage of the case, the Court finds that Mr. Salen has, for

the purposes of summary judgment, sufficiently stated that he subjectively experienced a hostile

work environment at Blackburn.  *See Redd*, 678 F.3d at 174 (at summary judgment stage, "all

permissible inferences and credibility questions resolved in favor of the party against whom

judgment is sought.").

### 2.   Because of Gender

To make his workplace harassment claim, Mr. Salen must show that the mistreatment that he

alleges occurred "because of his gender."  *Oncale*, 523 U.S. at 79 ("Title VII aims to eradicate

discrimination on the basis of sex, not enact a general civility code on the American workplace.")

(internal citations omitted).  If the "harassing conduct [is] motivated by sexual desire," the jury may

infer discrimination on the basis of sex, as it would in the male-female context.  *Id.* at 80.

Furthermore, when a harassment alleged involves touching an intimate body part, "a jury [can] easily

infer [the] stated desire" to touch someone's penis or breasts, regardless of the gender of the speaker,

were motivated by the employee's gender.  *Redd,* 678 F.3d at 181.

17

Mr. Salen alleges that Andre Blackburn touched his penis and the record indicates that Andre Blackburn is sexually attracted to men.  While the record reveals other potential motivating factors—Andre Blackburn's desire to help Mr. Salen keep his balance while hanging the poster, his emotional instability—a jury could reasonably conclude that he touched Mr. Salen because of Mr. Salen's gender.

### 3.    Liability of Employer

Employers are not always liable under Title VII and CFEPA for hostile work environments created by their employees. Beyond demonstrating a hostile work environment, a plaintiff must "show a basis for imputing the objectionable conduct to the employer." *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010).  When an employee's supervisor engages in the harassing conduct, it is "automatically imputed to the employer," unless the employer proves an affirmative defense by a preponderance of the evidence.  *Id., see also Faragher,* 524 U.S. at 807 ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee.").  If the harasser is the victim's co-worker, the employer will be liable only if it is negligent, that is, if it either "provided no reasonable avenue for complaint" or knew or should have known of the harassment but did nothing about it.  *Howley*, 217 F.3d at 154; *Faragher*, 118 S. Ct. at 2289 (noting general agreement among circuits that negligence standard governs employer liability for co-worker harassment).

### a.    Mr. Salen's Supervisors

Mr. Salen alleges that he was harassed by Andre Blackburn, who was Blackburn's Human Resources manager.  Mr. Salen also alleges that Jorge Rodriguez, as well as "many co-workers," contributed to the hostile work environment by teasing him about his relationship with Andre.  The

issue is whether Blackburn should be directly liable for the actions of these employees.  At this stage of the case, the answer is yes.

An employer may be vicariously liable for unlawful harassment by one of its employees only when it has "empowered [that] employee to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013).  In *Vance*, the Supreme Court explained that a tangible employment action would be a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id.*

Andre Blackburn was involved in decisions concerning Mr. Salen's employment.  The record reveals Mr. Blackburn participated in the "huddle" that made the decision to terminate Mr. Salen after his resignation.  *See* Andre Blackburn Dep. 147: 14-19.  As Human Resources manager, Andre Blackburn also had some supervisory responsibilities, although the record does not make clear his specific managerial duties. Although he may not have been empowered to make hiring and firing decisions alone, it is clear that Andre Blackburn had some supervisory authority over Mr. Salen.

Moreover, as the child of the co-owners of an intimate family-owned company, Mr. Blackburn may have been imbued with greater supervisory powers.  *See Dillon v. NED Mgmt.*, No. 13-cv-2622, 2014 U.S. Dist. LEXIS 17903, at *7-9 (E.D.N.Y. Feb. 11, 2014) ("The jury could reasonably find that the marital relationship included a strong influence by the husband on his wife and her son, the owner of the family company, equivalent to supervisory power. Based upon subtleties of the relationship and the nature of the business, the natural concern for the success of a family member can support that conclusion."); *Gillman v. Inner City Broad. Corp.*, 2011 U.S. Dist. LEXIS 4759, at *7-8 (S.D.N.Y. Jan. 18, 2011) (finding that Ms. Sutton, an officer, shareholder and former employee of defendant company, could be considered to have "decision-making authority"

because plaintiff "understood that '[s]he was a Sutton,' the implication being that the family members had the power to hire or fire, [and] a jury could find that Ms. Sutton held at least apparent authority within ICBC because Gillman's impressions of her apparent authority were reasonable.").

While the record is unclear about whether Andre Blackburn was able to "bring the official power of the enterprise to bear" on Mr. Salen, s*ee Vance*, 133 S. Ct. at 2448, the fact remains that Blackburn was a family-owned company that chose to have a family member in charge of important matters, such as human resources, and a reasonable jury could conclude that Andre Blackburn had the support of his parents in anything he did. Andre Blackburn may not have weighed in on Mr. Salen's salary increases, disciplined Mr. Salen, or directed Salen's "day-to-day activities." *Id.* at 2454. Nevertheless, a jury could nevertheless conclude that Andre Blackburn was Mr. Salen's supervisor, based on his family relationship.

Additionally, Mr. Salen alleges that other employees, including Mr. Rodriguez, contributed to the hostile work environment he encountered at Blackburn. The record suggests that Mr. Rodriguez was equal to or slightly above Mr. Salen in the Company's managerial hierarchy. While disputed facts remain regarding Mr. Rodriguez's supervisory authority at Blackburn, a jury could certainly conclude that Mr. Rodriguez was Mr. Salen's supervisor. Both Mr. Rodriguez and Andre Blackburn could be considered supervisors, and their potential harassment can be imputed to Blackburn.

### b.    Blackburn's Affirmative Defense

Even if it is liable for the actions of Mr. Salen's harassers, Blackburn may be entitled to an affirmative defense if it can show, by the preponderance of the evidence, that (1) "the employer exercised reasonable care to prevent and correct promptly any harassing behavior and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities

provided by the employer or to avoid harm otherwise." *Gorzinski,* 596 F. 3d. at 103; *Faragher*, 524 U.S. at 807.[4]

Blackburn invokes the *Ellerth/Farragher* affirmative defense by arguing that Mr. Salen failed to take advantage of the company's corrective opportunities by failing to mention the fact that Andre Blackburn touched his penis during the company's investigative interviews, and that it provided a reasonable investigative process for Mr. Salen's complaints.  The Court finds that Blackburn cannot invoke the affirmative defense.   Blackburn failed to provide a route for Mr. Salen's complaint that did not involve close family members of Andre Blackburn, the alleged harasser.  A reasonable jury could find that this failure demonstrated a lack of reasonable care on part of the Company.  Furthermore, a jury could conclude that it was not unreasonable for Mr. Salen to withhold intimate and uncomfortable details during Blackburn's investigation of his complaint, given that the investigation was conducted by close family members of Andre Blackburn.

### A.    Blackburn's Reasonable Care

Mr. Salen argues that Blackburn failed to provide him with a reasonable avenue for complaining about sexual harassment, pointing to deficiencies in the company's handling of the April 10, 2013 incident.  Specifically, he argues that Blackburn inappropriately relied on Gabriel Blackburn, a non-employee and Andre's brother, to investigate Mr. Salen's complaint.  He also emphasizes the fact that Irene and Abigail Blackburn did not reschedule a scheduled meeting between Mr. Salen and Andre Blackburn, at which Andre Blackburn was supposed to apologize to him.  The Court agrees with Mr. Salen.

---

[4] An employer may raise the *Faragher/Ellerth* defense only if either (1) the employee's supervisor took no "tangible employment action," which involves an official company act, against the employee; or (2) any tangible employment action taken against the employee was not part of the supervisor's discriminatory harassment. *See Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 765. Mr. Salen has alleged that he was constructively discharged.  The Court need not address whether Mr. Salen's constructive discharge was "part of the supervisor's discriminatory harassment," because it finds that Blackburn's defense fails.  *Id. See also Gorzynski*, 596 F.3d at n.3.

In assessing whether an employer has taken "reasonable care" under the first prong of the defense, a Court must assess not only whether the employer created and disseminated an effective sexual harassment policy, but also whether the policy was "seriously enforced." *Willburn v. Fleet Fin. Grp., Inc*., 170 F. Supp. 2d 219, 229 (D. Conn. 2001).  An employer cannot be insulated from liability because it created a complaint procedure or conducted an investigation of the alleged harassment. *Reed v. A.W. Lawrence & Co*., 95 F.3d 1170, 1180 (2d Cir. 1996) ("We know of no authority, and none has been drawn to our attention, to support the defendant's suggestion of an alternative per se rule that the availability of a complaint procedure and an investigation of the complaint under that procedure, standing alone, requires us to reach the legal conclusion that the misconduct of a co-worker cannot be imputed to the employer.").

In this case, the parties do not dispute the sufficiency of Blackburn's written harassment policy.  The record suggests that Blackburn's workplace rules included a procedure for the investigation of harassment complaints and that Blackburn disseminated these rules to Mr. Salen.

A reasonable jury, however, could find serious flaws in the investigation of Mr. Salen's complaint.  Three Blackburn employees participated in the investigation of Mr. Salen's complaint, and all three were close relatives of Mr. Salen's alleged harasser.  First, Abigail and Irene Blackburn—Andre Blackburn's mother and sister-in-law—addressed the issue.  After Abigail and Irene Blackburn arranged for and then cancelled a meeting between Andre and Mr. Salen, Gabriel Blackburn, Andre Blackburn's brother, conducted a formal investigation of the event.  Blackburn argues that Gabriel Blackburn's investigation was reasonably thorough.  Mr. Salen responds that Gabriel did not interview "key witnesses" to Mr. Salen's alleged harassment, but the record reveals that Gabriel did interview each of the co-workers who, by Mr. Salen's own admission, witnessed the actual event.  He also spoke to Andre Blackburn, even if only by e-mail, and Mr. Salen.

The simple fact that Gabriel and Andre Blackburn were brothers, however, calls into question the reasonableness of Defendant's investigative practices.  This family-owned company chose to have its own family members investigate a complaint of sexual harassment made against another member of its family. Just as importantly, the person under investigation was the family member in charge of Human Resources for the company.  *See, e.g. Avila-Blum v. Casa de Cambio Delgado, Inc.*, 519 F. Supp. 2d 423, 430 (S.D.N.Y. 2007) (holding that individual supervisor could be liable as an alter-ego of company because plaintiff testified that a co-worker had told her that "my father [the supervisor] makes all the decisions around here" and further established that the supervisor "maintained complete control over the operation of the corporation," making her attempts to rectify her hostile work environment "futile").

### B.    Mr. Salen's Use of Blackburn's Complaint Procedure

Defendant argues that Mr. Salen unreasonably failed to take advantage of Blackburn's sexual harassment policy because he "never submitted any complaint to the employer of what amounts to a criminal sexual assault."  Def.'s Mem., 33.   Blackburn points to the fact that Mr. Salen did not tell any Blackburn employee that Andre touched his penis and told Gabriel, Irene and Abigail Blackburn that he was not alleging sexual harassment.  The Court disagrees.

An employer is entitled to an affirmative defense against liability for an employee's harassment if the employee "acted unreasonably in failing to avail herself of the company's internal complaint procedures."  *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2d Cir. 2001).   The defendant may assert its affirmative defense with evidence that the plaintiff failed to avail himself of the defendant's complaint procedure, and then by relying on the absence or inadequacy of the plaintiff's justification for that failure.  *Id.*  An employee's reluctance to report harassment is reasonable if it is based on a "credible fear" that his or her complaint will "not be taken seriously or that she would

23

suffer some adverse employment action as a result of filing a complaint," the employee's reluctance to report a complaint was reasonable. *Id.*, citing *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (1999).   Generally, the plaintiff must produce evidence that the employer ignored or resisted similar complaints or took adverse action against employees in response to complaints. *See Leopold*, 239 F. 3d at 246.   However, the plaintiff can also present other evidence, such as evidence about the relationship of the alleged harasser with company management, to substantiate his or her credible fear of retaliation.  *See, e.g. Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-CV-5528, 2014 U.S. Dist. LEXIS 134789, at *90 (E.D.N.Y. Sep. 24, 2014) (applying the affirmative defense because "plaintiff has not presented any evidence to substantiate her assertion that she had a credible fear of retaliation, such as evidence about the relationship between [the harasser] and human resources that caused her to fear retaliation").

In this case, a jury could infer that it was reasonable for Mr. Salen to omit certain details from his complaint to his employer.  Mr. Salen quickly spoke to a Blackburn supervisor about the April 10 incident.  He then reported to Abigail Blackburn that Andre Blackburn did something that made him "uncomfortable."  Indeed, Abigail emphasized the fact that Mr. Salen felt uncomfortable in e-mails to Irene and Steven Blackburn, who she calls "Mom" and "Dad."  While none of the Blackburns, Abigail, Irene, and Steven, knew the extent of the harassment that Mr. Salen now alleges, they knew that his allegations were somewhat serious, and that they involved sexual behaviors that could be awkward for Mr. Salen to discuss.  Even after learning of a serious—if vague—complaint against a family member, Blackburn's management did not provide an avenue for Mr. Salen's complaint that did not involve other family members.  Indeed, after Abigail Blackburn organized but then cancelled a conversation between Mr. Salen and Andre Blackburn, the company then delegated the investigation to Gabriel Blackburn, an outside employee and Andre Blackburn's brother.

24

A jury could infer that Mr. Salen was reasonable in his reluctance to describe Andre Blackburn's behavior to the supervisors who investigated his complaint, because these supervisors were all close relatives of Andre Blackburn.  In a family-owned company, a jury could find that a complaint against the company is essentially a complaint against the family, making complaining "futile."  *Avila-Blum*, 519 F. Supp. 2d at 430 (plaintiffs attempts to rectify her hostile work environment were "futile" because she complained to the harasser's daughter, who responded that "my father makes all the decisions around here").  A jury also could conclude that Mr. Salen's vague complaints about being uncomfortable were, in fact, sufficient to put Blackburn on notice of the harassment and rebut the Company's affirmative defense.  *See Redd*, 678 F.3d at 183 (holding that summary judgment was inappropriate because "there appear[ed] to be a factual dispute to be resolved as to the sufficiency of [the plaintiff's] complaints about [the supervisor's] conduct").  Given the disputed evidence about Mr. Salen's use of Blackburn's complaint policy, the Court cannot grant summary judgment to Blackburn based on the *Ellerth/Farragher* affirmative defense.  Blackburn's motion for summary judgment on Counts One and Two therefore is DENIED.

### c.  Retaliation under Title VII and CFEPA

Title VII prohibits an employer from discriminating "against any of his employees ... because [the employee] has opposed any practice made unlawful by [Title VII]." 42 U.S.C. §2000e-3(a). "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir. 1988).  Similarly, CFEPA prohibits an employer from "expel[ling] or otherwise discriminat[ing] against any person because such person has opposed any discriminatory employment practice."  Conn. Gen. Stat. §46a-60(a)(4).

To make out a prima facie case of retaliation Mr. Salen must show that (1) he engaged in a constitutionally protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against him; and (4) a causal connection exists between the protected activity and the adverse action. *Reed,* 95 F.3d at 1178 (2d Cir. 1996).

Mr. Salen claims that defendant retaliated against him for making an internal complaint about his uncomfortable experience with Andre Blackburn on April 10, 2013. He points to two adverse actions that the defendant took against him: first, that Blackburn "threatened" him in the July 23, 2013 "letter of expectation," and second, that he was terminated from his employment after he resigned.   Blackburn argues that these two instances are not legally sufficient adverse employment actions for the purposes of these statutes.  The Court disagrees.

### 1.   Mr. Salen's Constitutionally Protected Activity

The Court assumes that Mr. Salen's complaints constituted a constitutionally protected activity and that Blackburn was aware of this activity.  To show that he engaged in a constitutionally protected activity, the plaintiff need not establish that the conduct he opposed was actually a violation of Title VII, but only that he possessed a "good faith, reasonable belief that the underlying employment practice was unlawful" under that statute.  *Galdieri-Ambrosini*, 136 F.3d at 291.  The Court must assess the reasonableness of the plaintiff's belief in light of the totality of the circumstances. *Reed*, 95 F.3d at 1178.  While Mr. Salen's repeated assertions that he was not claiming sexual harassment during the complaint process call into question his belief that Andre Blackburn's behavior was unlawful, the Court recognizes that the reasonable person standard is a flexible one.

To show that an employer was aware of its employee's protected activity, a plaintiff generally must show only that the employer was aware of his complaint.  However, "implicit in the

26

requirement that the employer [was] aware of the protected activity is the requirement that the [employer] understood, or could have reasonably understood," that the plaintiff's complaints, constituting the protected activity, were based on conduct prohibited by Title VII. *Galdieri-Ambrosini*, 136 F.3d at 292; *see also Manoharan*, 842 F.2d at 593.  As discussed above, Mr. Salen complained to various Blackburn supervisors that Andre Blackburn made him "uncomfortable."  The record contains disputed facts about whether this complaint made defendants aware that Mr. Salen's complaints concerned conduct prohibited by Title VII, because he eliminated the most crucial fact about the single incident of harassment from his complaint.  In this case, Court assumes that Blackburn's awareness of Mr. Salen's complaint constituted sufficient notice of his engagement in a constitutionally protected activity.

### 2.    Blackburn's Materially Adverse Employment Actions

Even assuming that Mr. Salen can make the initial prongs of the *prima facie* case for retaliation, he still must provide sufficient evidence that he suffered an adverse employment action at Blackburn's hands.  A "material adverse action" is an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  While this is an objective test, "context matters" and "even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Id.* at 69.  Generally, though, "petty slights or minor annoyances that often take place at work and that all employees experience are not materially adverse."  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2012).

### a.  The July 23 Letter of Expectation

Mr. Salen argues that Blackburn's July 23, 2013 letter of expectation represented a materially adverse employment action designed to punish him for complaining about Andre Blackburn's behavior.  A reasonable jury could agree.

Disciplinary citations or reprimands are not "materially adverse" when they reflect the defendant's "enforcement of its preexisting disciplinary policies in a reasonable manner," but can be materially adverse with additional evidence suggesting that they were designed to quell complaints. *Rivera*, 743 F.3d at 26 (internal citations omitted).  In *Rivera*, the Second Circuit held that defendant's discipline of plaintiff Talton was an adverse employment action because it occurred immediately after Talton's filing of an EEOC complaint, and included an admonishment for making "false accusations." *Id.*  The court concluded that "a reasonable juror could infer that [the defendant's] swift response to the complaints by Talton's co-workers was designed to, and did, send a message that Talton's employment at Lift Line was in serious jeopardy as a result of the EEOC charges." *Id.* at 27.  While there is evidence on the record suggesting that Blackburn had admonished Mr. Salen in the past for discussing personal matters of co-workers in public or on Facebook, a reasonable jury could also find that the letter from Gabriel Blackburn constituted a threat to stay silent about the April 10 incident.

Furthermore, a reasonable jury could conclude that the letter of expectation played into a larger pattern of events that led to Mr. Salen's constructive discharge.  The record does not contain evidence that Blackburn's letter of expectation had materially adverse consequences on Mr. Salen's employment or resulted in his termination.  *See Trigg v. New York City Transit Auth.*, 91 FEP 66, 74 (E.D.N.Y. 2001), *aff'd*, 50 Fed. App'x. 458 (2d Cir. 2002) ("Negative evaluations alone, without any accompanying adverse consequence, are not adverse employment actions.").  However, Mr. Salen

28

has alleged that he was constructively discharged from employment, as discussed below.  While the letter of expectation itself may not be a materially adverse employment action, the Court understands the letter as a component of the work environment that may have led to Mr. Salen's constructive discharge.

### b.  Mr. Salen's Termination

Mr. Salen also argues that Blackburn terminated his employment to punish him for complaining about his alleged harassment.  However, the record suggests that Mr. Salen sent a resignation letter to supervisor Ray Erazo stating that he was "putting in [his] two-week notice" to end [his] employment."  It was only after receiving this letter that Blackburn terminated Mr. Salen. While a defendant's termination of an employee would constitute an "adverse employment action," a defendant's termination of an employee who has resigned does not.  *Davis v. Koffee Kup Bakery, Inc.*, No. 2:15-cv-152, 2016 U.S. Dist. LEXIS 109664, at *17-18 (D. Vt. Aug. 18, 2016) ("The Second Circuit defines an adverse employment action as a materially adverse change in the terms and conditions of employment. Where an employee voluntarily quits, there is no adverse employment action," citing *Evans v. Davie Truckers, Inc*., 769 F.2d 1012, 1014 (4th Cir. 1985) (internal quotations omitted).  Because Mr. Salen had resigned when Blackburn terminated him, the termination only effected two weeks of his prospective employment and did not constitute a materially adverse change in the conditions of his employment.

In some cases, though, courts have denied summary judgment to defendants whose employees left voluntarily because the record contained questions about "whether Plaintiff voluntarily resigned or was pressured to do so with the veiled threat of termination," resulting in a constructive discharge.  *Koffee Kup Bakery* at *18-20; *Fetcho v. Hearst Conn. Post, LLC*, 103 F. Supp. 3d 207, 211-12 (D. Conn. 2015) (denying summary judgment where the defendant claimed the

29

plaintiff "resigned voluntarily" but the "circumstances under which plaintiff's employment ended

[were] in dispute," primarily because of evidence that plaintiff "refused to sign a resignation letter");

*Cadet v. Deutsche Bank Secs. Inc.*, No. 11-cv-7964, 2013 U.S. Dist. LEXIS 87328, at * 11 (S.D.N.Y.

June 18, 2013) ("A voluntary resignation does not constitute an adverse employment action unless

the plaintiff was constructively discharged—i.e., the resignation was in fact involuntary as a result of

coercion or duress.").  While he maintains that he was terminated, Mr. Salen also alleged in his

CHRO claim that he was constructively discharged.

  "To find that an employee's resignation amounted to a constructive discharge, the trier of fact

must be satisfied that ... a reasonable person in the employee's shoes would have felt compelled to

resign." *Whidbee v. Garzarelli Food Specialties, Inc*., 223 F.3d 62, 73 (2d Cir. 2000).  More

specifically, the plaintiff must show that the employer "deliberately ma[de] an employee's working

conditions so intolerable that the employee [wa]s forced into an involuntary resignation." *Pena v.*

*Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983).  "The [constructive discharge] standard is not

easily met." *Arroyo v. WestLB Admin., Inc*., 54 F. Supp. 2d 224, 231-32 (S.D.N.Y. 1999).  In *Arroyo*,

the plaintiff was subject to "approximately five or six" incidents of racially derogatory insults and

remarks, including being called a "f ---- g spic," a "wetback," and an "asshole" on three separate

occasions, over twenty-five months. *Id.* at 230-31. The court found that this "sporadic" and "random"

harassment would not compel a reasonable person to resign.  *Id.  See also Stetson v. NYNEX Serv.*

*Co*., 995 F.2d 355, 360 (2d Cir. 1993) (finding no constructive discharge where a plaintiff alleged he

was "ridiculed by his supervisor, ... harangued by executives, ... and suffered high blood pressure as a

result of his supervisor's treatment"); *Martin v. Citibank, N.A*., 762 F.2d 212, 221 (2d Cir. 1985)

(finding no constructive discharge when plaintiff testified that her supervisor made "unfounded"

complaints about her attitude to co-workers, she had "received an informal, oral warning concerning

complaints about her attitude from several customers and from co-workers," and her supervisor loudly mentioned that she had been polygraphed after money went missing at defendant bank).

Here, Mr. Salen alleges that his co-workers teased him on several occasions in September 2013—presumably before he resigned on September 20, 2013—on account of his harassment with Andre Blackburn.  He also alleges that he "was promised an apology that he never received." Pl.'s Opp. Mem., 15.  Finally, he points to two incidents that suggest that Blackburn employees wanted him to leave: (1) Irene Blackburn asking him if "this was the best job [he'd] ever had?" when he initially complained about the harassment; and (2) Jorge Rodriguez, a supervisor, telling him that he "needed to be sure where this could end up" before listening to Salen's complaints about Andre Blackburn.[5]  *Id.*

The Court will construe Mr. Salen's claim as an allegation that he was constructively discharged and will let a jury decide whether his retaliation claim stands.  The several weeks of teasing that he describes does not necessarily meet the heightened standard required to establish a constructive discharge.  Furthermore, the statements from Irene Blackburn and Jorge Rodriguez do not by themselves suggest that Blackburn was threatening Mr. Salen with termination if he did not resign.  Ordinarily these factual allegations might fall short.  The family dynamic existing at this company, however, suggests that any such factual determinations should be made by a jury.  Although Blackburn points to evidence that it never intended to force Mr. Salen to leave, that "argument goes to the weight of the evidence, not its sufficiency." *Fox v. City Univ. of N.Y.*, No. 94-4398, 1999 U.S. Dist. LEXIS 718, at *20 (S.D.N.Y. Jan. 25, 1999).  Accordingly, the Court DENIES summary judgment on Counts Three and Four of the Complaint, which allege retaliation under Title VII and CFEPA.

---

[5] Plaintiff does not provide a citation for this statement in his opposition brief and it is not included in the Statements of Facts provided by the parties.

**IV.   Conclusion**

Defendants' Motion for Summary Judgment [Doc. No. 61] is DENIED.

SO ORDERED at Bridgeport, Connecticut this 6th day of January, 2017.

/s/ Victor A. Bolden

VICTOR A. BOLDEN

UNITED STATES DISTRICT JUDGE